# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 27, 2000

## STATE OF TENNESSEE v. BERNARD K. JOHNSON

**Appeal from the Criminal Court for Knox County**
**No. 65071     Ray L. Jenkins, Judge**

---

### No. E2000-00009-CCA-R3-CD
### January 31, 2001

---

The defendant appeals to challenge the sufficiency of the evidence supporting his convictions of sexual battery and aggravated kidnapping and the propriety of the felony sentences imposed by the trial court.  We affirm the convictions, but upon notice of plain error, we reverse a misdemeanor conviction of aggravated criminal trespass. Finding the misapplication of some enhancement factors, we modify some of the sentences.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part and Modified in Part; Reversed and Vacated in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the Appellant, Bernard K. Johnson.

Paul G. Summers, Attorney General and Reporter; Clinton J. Morgan, Counsel for the State; Randall E. Nichols, District Attorney General; and Paula Ham, Assistant Attorney General, for the Appellee, State of Tennessee.

### OPINION

The defendant, Bernard K. Johnson, was convicted and sentenced in the Knox County Criminal Court as follows:

| Conviction Offense | Class | Range | Sentence |
|---|---|---|---|
| Sexual battery | Class E felony | II | four years |
| Aggravated kidnapping | Class B felony | I | eleven years |
| Aggravated assault | Class C felony | II | nine years |
| Aggravated criminal trespass | Class A misdemeanor | N/A | eleven months, 29 days. |

See Tenn.Code Ann. §§ 39-13-505 (sexual battery), -304 (aggravated kidnapping), -102 (aggravated assault); § 39-14-406 (aggravated criminal trespass). The trial court imposed the three felony sentences to run consecutively to one another and the misdemeanor to run concurrently with the felonies, for an effective sentence of 24 years.[1] On appeal, the defendant challenges the sufficiency of the convicting evidence of aggravated kidnapping and sexual battery and the propriety of the felony sentences. After a review of the record, the parties' briefs, and the applicable law, we affirm the felony convictions but modify the sexual battery and aggravated assault sentences. Upon notice of plain error, we reverse and vacate the misdemeanor conviction imposed in count (12) and enter a judgment of acquittal on count (12) of the indictment.

The victim, Mildred McMillan, testified at trial that she had been friends with the defendant since 1995 and had a "relationship" with him. She tried to end the relationship in 1996 but testified, "He wouldn't leave me alone." She obtained a protective order against the defendant, and in the spring of 1997 she obtained an assault warrant against him. By November 1997, she had moved her belongings into a house located at 1637 Boyd Street in Knoxville; however, she claimed that she had not set up the house as a residence and did not reside there because, if she stayed there, the defendant would "appear." She opted instead to reside serially with different relatives.

On November 26, 1997, Thanksgiving Eve, she went to the home of Tammy Styles, the victim's granddaughter's mother. The defendant, who wanted to share a Thanksgiving meal with the victim, came to Styles's house on Thanksgiving Day, but the victim refused to come out to talk to him. The victim participated in Thanksgiving festivities with the Styles family; however, the victim was alone in the Styles house on Thanksgiving evening when the family went to visit Tammy Styles's father. The defendant then arrived at the Styles house and knocked on the door. The victim declined to open the door and called 911. Although the victim hung up when the 911 operator answered, the 911 operator returned the call. The victim testified that she was reluctant to speak freely to the operator because the defendant was watching her through a window and could overhear her phone conversation. She said she was afraid.

The defendant removed a piece of cardboard that framed a window air conditioner and pushed the air conditioner from the window onto the interior floor. When the defendant came through the window, the victim hit him on the head with a chair. The defendant then came into the house and hit her in the face with his hand. He picked up two knives, grabbed her by her hair, and

---

[1]    The defendant's four convictions resulted from a jury trial on a twelve-count indictment. Counts (1) through (5) alleged aggravated rape via bodily injury to the victim and resulted in the sexual battery conviction on count (1) and acquittals on counts (2) through (5). See Tenn. Code Ann. § 39-13-505 (1997) (proscribing sexual battery). Count (6) alleged especially aggravated kidnapping, and counts (7) through (10) alleged aggravated kidnapping. See Tenn. Code Ann. § 39-13-304(a)(1), (3), (4), (5) (1997) (proscribing the modes of committing aggravated kidnapping that were specified in indictment counts (7) through (10)). The jury convicted the defendant on count (8), aggravated kidnapping "with the intent to inflict serious bodily injury or to terrorize" the victim. See Tenn. Code Ann. § 39-13-304 (a)(3) (1997). The jury acquitted the defendant on counts (6), (7), (9), and (10). Count (11) charged the defendant with, and the jury convicted him of, aggravated assault committed in violation of a restraining order. See Tenn. Code Ann. § 39-13-102(c) (1997). Count (12) charged the defendant with aggravated burglary, and on this count the jury convicted him of aggravated criminal trespass. See Tenn. Code Ann. § 39-14-406 (1997) (aggravated criminal trespass).

pulled her through the house while he looked to see if anyone else was present. He kicked or knocked down a bedroom door.

The defendant put down the knives but hit the victim again in the face. "I had a little cut up under one of my eyes," she testified. "The scar is still there. And my nose was messed up." She bled from the nose and the mouth. The victim testified that she "feared for [her] life." The defendant said, "Let's go." The victim testified, "I said no, but he took me anyway." He took her by the hair and pushed her out the door. He continued to hold her by her hair and hit her in the face with his hand.

The defendant took the barefoot victim, her purse, and her shoes to an empty house on Boyd Street adjacent to the victim's house. He "put" her through a window and followed her inside. Going through the window, the victim scraped her stomach and knee and bruised her leg.

Inside the house, the defendant removed the victim's pants and penetrated her vaginally with his penis. She testified that she did not consent to entering the house and did not consent to the sexual penetration. She testified, "He kept hitting me in my face and saying he was going to kill me and saying that he loved me and that he wanted to be in my life the rest of my life and wanted me to be in his life the rest of his." The defendant penetrated her vaginally a second time and then "forcefully" made her fellate him, both acts being accomplished without her consent. Then, the defendant penetrated her anally, which was "very painful" to her. He rummaged her purse to find some petroleum jelly to serve as a sexual lubricant. Finding none, he settled for a tube of penetrating, calefacient arthritis creme, which he applied to his penis. Soon thereafter, in search of a working water tap, he hustled the victim to her own house, with himself in hot pursuit.

The victim testified that she could not get away from the defendant. He procured a comforter from the house and informed her that they were going to "hobo" a train to go to North Carolina to get married. He "jerked" her, and they went to a rail siding three or four blocks away where they entered a rail freight car. The defendant spread the comforter on the floor of the car, removed the victim's clothing, hit her again, and threatened again to kill her. He penetrated her again vaginally without her consent. She testified, "I felt scared and wondered if I was – wondering if he kill [sic] me, how long it would take – take them to find my body." After a period of time, it became too cold to stay in the rail car, and the defendant took the victim back to the empty house on Boyd Street.

The defendant again "put" the victim through the window. Once they were both inside, the defendant raped her again. He asked her if she would go with him to Florida. She said she would, because she "was scared he was going to kill [her] if [she] said no." The defendant wrapped his legs and arms around her and slept, but she was "too cold and scared to sleep."

The next morning, the defendant took the victim to her house and burned some of her bloody clothes in the backyard. He soaked her pants and shoes in water and chlorine in the bathtub. Later, he made her walk with him to his friend's house. On the way, the victim's sister, who was

accompanied by one or two of her sons, stopped her car when she saw the victim and told the victim to get into the car. The victim "wiggled" out of the defendant's grasp and got into the car. Her sister took the victim to her mother's house, and from there the victim went to the hospital emergency room.

In summary, the victim testified that the events of November 27 and 28, 1997 were "horrifying" and that she "never thought that [she] had the opportunity to escape." She denied that any of the sexual activities were consensual and that she went voluntarily to any of the locations where the sex occurred. She denied sharing a meal with the defendant during the episode and denied that the defendant brought clothes to her at the Styles house on Thanksgiving Day.

Edna Holliday, Tammy Styles's next-door neighbor, testified that on Thanksgiving night she heard someone "bamming" on the Styles's door. She looked out and saw a man walking along the side of the Styles house. Afterward, she heard glass breaking, and ten or fifteen minutes later, she saw a man push the victim onto the porch, and the two of them "walked on around the house." Ms. Holliday did not see the man holding onto the victim; however, based upon subsequent testimony presented by a police officer, Ms. Holliday apparently called 911.

Tammy Styles testified that the victim spent the night of November 26, 1997 in Styles's home and stayed there all day on Thanksgiving, November 27. The defendant came to Styles's home Wednesday night, and on Thanksgiving morning, he knocked on the door and asked that the victim be sent out. The victim refused to go out, and the defendant left. About 7:00 or 7:30 p.m. on Thanksgiving Day, Styles left the victim alone in her house when she and the rest of her family went to visit Styles's father. She left the house "nice, neat, clean and in order." About an hour later, she began calling back to her house to check on the victim. Alarmed that the victim did not answer any of her calls, she returned to her house to find the air conditioner "knocked out," broken glass in the house, furniture out of place, and the place "really tore up." Her son's bedroom door was kicked or knocked off its hinges. There were blood drops on the floor and walls in the living room, hallway, and bathroom. The victim was gone. Styles called 911. When she next saw the victim, on Friday afternoon at the hospital, the victim's appearance had changed "tremendously." The victim's eyes had nearly closed from swelling and her nose looked dislocated.

On cross-examination, Styles admitted that when the defendant came to her house on Thanksgiving Day, he brought some of the victim's clothes.

The emergency room physician who treated the victim testified that she had swelling and bruising around both eyes, a scratch on her right elbow, a small amount of bleeding in her left eye, and some mild abdominal pain. He performed a rape examination, which was negative for the presence of sperm and revealed no trauma or injury to the victim's vagina or anus.

A police officer who investigated the case and saw the victim at the hospital testified that the victim "had been beaten about the face [and] the nasal area was real swollen . . . and apparently had been bleeding."

-4-

The same officer interviewed the defendant and recorded a statement. The state introduced a transcript of his pretrial statement. In it, the defendant, crying, stated, "I just wanted her to be with me on Thanksgiving, man. I don't have no family." He indicated that he went to the Styles house to see if the victim was coming home, that when she would not open the door he removed the cardboard around the air conditioner so he could speak to her, and that when he did so, the air conditioner fell out of the window onto the floor. He had reached inside the window to try to lift the air conditioner back into place, when the victim hit him with a chair. He came inside and slapped the victim. He was upset that, because of the damage to the Styles house and the fact that he had been drinking, his probation would be revoked. He wanted to leave the Styles house and avoid being apprehended. He admitted having vaginal, oral and anal sex with the victim but asserted, "[A]in't no body raped her." Also, he admitted that he took the victim to the rail car and the empty house but maintained that she accompanied him voluntarily and consented to the sexual activities.

Juanita Jones testified for the defense that the defendant was a friend of her husband, Porter Jones, and that she knew the victim through the defendant. Jones knew them as a "couple" and observed no assaults or arguments between them. She saw the victim and the defendant walking toward her house on Friday afternoon, the day after Thanksgiving. They asked Jones if she had any Thanksgiving food left over, but before the victim and the defendant proceeded any further, the victim's sister pulled up in her car and told the victim to get in.

The defendant then testified that the victim had been his girlfriend for two or three years, and in November 1997, he was living at 1637 Boyd Street with the victim. He testified that he and the victim spent the day before Thanksgiving in the house smoking crack cocaine and getting high. On that day, he bought a turkey from his uncle, and he and the victim took the turkey to Porter Jones's house and put it in the freezer. The victim went to Styles's house on Wednesday evening, and after spending time at the Jones's, the defendant retired to the house at 1637 Boyd Street.

On Thursday morning, the defendant went to Styles's house to see if the victim still planned to spend Thanksgiving with him. She asked him to get a change of clothes for her. He went back to the Boyd Street house, retrieved some of her clothes, and took them in a paper bag to the Styles house, where he gave them to Tammy Styles's son. The victim did not come out. The defendant then went to the Jones residence, where he drank beer and watched football. He did not eat there, but Juanita Jones prepared a plate of food which the defendant took with him to the Boyd Street house. About 7:00 p.m., the victim still had not returned home, so he walked to Styles's house. He then related the version of the events that began with the accidental falling of the air conditioner, as he had narrated them in his statement.

The defendant testified that, after the victim took out an assault warrant against him in April 1997, he went to Atlanta and would have stayed there had the victim not called and persuaded him to return to Knoxville. On Thanksgiving night, when he realized the Styles house had been damaged, he announced his intention to leave town again because he did not wish to be locked up on a holiday. The victim told him that he was not going to leave her alone again, and they hugged, kissed and made up. The defendant told the victim that he was going back to Atlanta, and

she said, "I'm going with you." She accompanied him voluntarily to the railroad siding, and after they became too cold to stay in the rail car, they returned to her Boyd Street house, where they saw her sister's car leaving. The defendant was afraid to stay in the house, so he retrieved a blanket and the plate of food, and the couple went through the window into the vacant house next door. They ate the food, had sex, and slept.

Later the couple returned to the victim's house, had sex, and slept until morning. When the defendant awoke, he decided he would call his probation officer. The victim said that she would go with him to Porter Jones's house to call. Before they arrived, the victim's sister arrived, and the victim's nephews ran the defendant off by firing shots at him. He hid under the porch of a house that belonged to two elderly ladies, where he was subsequently apprehended by the police.

The defendant denied knocking or kicking the Styles's bedroom door from its hinges, hitting the victim at any time after leaving the Styles house, engaging in anal sex with the victim, and burning any clothes. He admitted that he slapped the victim as many as three times at the Styles house. He maintained that she followed him, that he tried to leave, but "she's the one came with me."

I.

We have combined under one rubric the defendant's first three issues which challenge the sufficiency of the evidence supporting the sexual battery and the aggravated kidnapping convictions.[2]

When a defendant challenges the sufficiency of the convicting evidence, the appellate court must determine whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979); see Tenn. R. App.

---

[2] The defendant orders his first three appellate issues as follows: (1) The evidence is insufficient to support the sexual battery conviction; (2) the evidence is insufficient to support the aggravated kidnapping conviction; and (3) the "trial court erred in not granting appellant's motions for judgment of acquittal at the end of the state's case in chief and after the trial." The defendant cites no authority as the basis for the third claim; nor does he specifically mention the third claim in his argument in his brief.

The defendant "may not predicate error upon the fact that the trial judge denied his motion for judgment of acquittal at the conclusion of the state's proof. He waived this issue when he elected not to stand on his motion and introduced evidence in support of his defense." State v. Peat, 790 S.W.2d 547, 548-49 (Tenn. Crim. App. 1990). Of course, the defendant renewed his motion for a judgment of acquittal at the conclusion of all of the evidence, and this issue has not been waived. Id. at 549. Furthermore, a motion for judgment of acquittal that encompasses all of the proof in the case is not waived when it is made as part of a motion for new trial. State v. Brewer, 945 S.W.2d 803, 809 n.2 (Tenn. Crim. App. 1997). However, "[t]he standard by which the trial court determines a motion for judgment of acquittal [made at the end of all of the proof] is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). "[W]ith a denial of a motion for judgment of acquittal being inextricably linked to the sufficiency of the evidence, we consider the issues together" on appeal. Brewer, 945 S.W.2d at 809 n. 2.

P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable or legitimate inferences that may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). A conviction removes the presumption of innocence and raises a presumption of guilt on appeal. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

Sexual battery, as it pertains to the conviction on count (1), is the

unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; (2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent . . . .

Tenn. Code Ann. § 39-13-505(a)(1), (2) (1997). As used in section 39-13-505(a)(1), "'coercion' means the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Tenn. Code Ann. § 39-13-505(b) (1997). The term "sexual contact" includes

the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Tenn. Code Ann. § 39-13-501(6) (1997).

As it pertains to the conviction on count (8), aggravated kidnapping is false imprisonment committed with "the intent to inflict serious bodily injury on or to terrorize the victim or another." Tenn. Code Ann. § 39-13-304(a)(3) (1997). False imprisonment is committed by one who "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302 (1997).

In the light most favorable to the state, the evidence establishes the elements of both of these offenses.

The victim's testimony is sufficient to establish sexual contact via force or coercion or without the victim's consent. Her testimony described several non-consensual sexual contacts committed against her by the defendant, some of which were preceded by physical brutality. In the light most favorable to the state, sufficient evidence exists that the defendant sexually battered the victim.

The state established a case of aggravated kidnapping by showing that the defendant knowingly removed and confined the victim unlawfully so as to substantially interfere with her liberty and by showing circumstantially that he did so with the intent to terrorize the victim. After brandishing knives, pulling the victim through the Styles home by her hair, and demolishing a door in the house, the defendant forced the victim from the house by pushing her through the door and by leading her away while grasping her hair and hitting her. She testified that he threatened to kill her and that she feared for her life. She is a large woman who has arthritis, and she felt she never had an opportunity to escape safely until her sister and nephews appeared on the scene. Moreover, the defendant confined the victim in the rail car and the vacant house, despite conditions of extreme cold. Again, in the light most favorable to the state, the evidence establishes the offense of aggravated kidnapping as alleged in count (8).

We fully realize that proof of many of the elements of the crimes depended upon the credibility of the victim. We also realize that the defendant pointedly contradicted much of the victim's testimony and that, were his version to be believed, he would be innocent of sexual battery and aggravated kidnapping. Nevertheless, the defendant had his day in court before a jury. Unfortunately for him, the jury discredited his testimony and accredited much of the victim's, as was the jury's prerogative. As an appellate court, we may not reweigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not draw inferences from the evidence that differ from the inferences drawn by the trier of fact as to circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The issues of the credibility of witnesses, the weight given to their testimony, and all factual issues raised by the evidence are resolved by the trier of fact, not the appellate court. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). This court will not disturb a verdict of guilty due to the insufficiency of the evidence unless the facts contained in the record are insufficient as a matter of law for a rational trier of fact to find that the defendant is guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In short, the state made out a jury case. We may not disturb these verdicts.

II.

Count (12) charged the defendant with aggravated burglary. See Tenn. Code Ann. § 39-14-402, -403 (1997). The jury acquitted him of this offense but convicted him of aggravated criminal trespass, an offense that the parties and the trial court treated as "a lesser-included offense" of the greater, charged offense. See Tenn. Code Ann. § 39-14-406 (1997) (aggravated criminal trespass). As a matter of plain error, we vacate the judgment of conviction of aggravated criminal trespass and declare the defendant's acquittal on count (12) of the indictment. See Tenn. R. Crim. P. 52(b); Tenn. R. App. P. 13(b). We conclude that aggravated criminal trespass is not a lesser-included offense of aggravated burglary. Accordingly, the lesser offense was not charged in the indictment and cannot support a conviction.

Prior to our supreme court's decision in State v Burns, 6 S.W.3d 453 (Tenn. 1999), appellate courts of Tennessee had indicated that trespass is a lesser-included offense of burglary. See, e.g., State v. Langford, 994 S.W2d 126, 128 (Tenn. 1999); State v. Boyce, 920 S.W.2d 224 (Tenn. Crim. App. 1995); State v. Vance, 888 S.W.2d 776, 779 (Tenn. Crim. App. 1994) (suggesting an evidentiary approach analysis in saying, "Criminal trespass is a lesser included offense of aggravated burglary *under the facts in this case*) (emphasis added)). However, in Burns, our supreme court mandated a statutory approach to elements analysis, Burns, 6 S.W.3d at 466-67, and insofar as is relevant to the present case, it adopted the following test for determining lesser-included offenses:

> An offense is a lesser-included offense if:
>
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a lesser mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest . . . .

Id. at 467.

The statute proscribing aggravated burglary, Code section 39-14-403, incorporates the offense of burglary which is described in section 39-14-402. Generally, this section proscribes the entry into a building or conveyance "with the intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(1) (1997). Significantly, the statute defines "enter" as the intrusion of "any part of the body[] or . . . any object in physical contact with the body or any object controlled by remote control, electronic or otherwise." Tenn. Code Ann. § 39-14-402(b) (1997).

On the other hand, aggravated criminal trespass encompasses the entry on property when the intruder knows the entry is without the owner's consent and knows, or is reckless about whether the intruder's presence "will cause fear for the safety of another." Tenn. Code Ann. § 39-14-406(a) (1997). This section then defines "enter" to mean "intrusion of the entire body." Tenn. Code Ann. § 39-14-406(b) (1997); see Tenn. Code Ann. § 39-14-405(c) (1997) (in proscribing criminal trespass, defines "enter" as the "intrusion of the entire body").

Applying the Burns-mandated statutory elements analysis, we readily conclude that all of the elements of the lesser offense are not included within the elements of the greater. Thus, the (a) part of the Burns test is not satisfied. Moreover, the (b) part is not satisfied because the elements do not differ *in the respect that the additional element of the lesser offense* indicates a lesser culpability or lesser harm or risk of harm, although we acknowledge that the scienter elements of burglary suggest greater culpabililty than do the scienter elements of the lesser offense. Thus, we conclude that burglary or aggravated burglary may be committed without committing any form of

criminal trespass. Criminal trespass, aggravated or otherwise, is not a lesser-included offense of burglary, aggravated or otherwise. See State v. Lee Russell Townes, No. W1999-01126-CCA-R3-CD, slip op. at 7-8 (Tenn. Crim. App., Jackson, Aug. 18, 2000) (commenting that Burns may change the Langford result), pet. perm. app. filed (Tenn. Oct. 12, 2000); State v. Curtis Smith, No. 02C01-9602-CR-00051, slip op. at 8-9 (Tenn. Crim. App., Jackson, June 3, 1997) (pre-Burns holding that criminal trespass is not a lesser-included offense of burglary). In the present case, the indictment did not include aggravated criminal trespass, and that conviction may not stand. Because the jury apparently acquitted the defendant of aggravated burglary and burglary, and because we discern no other applicable lesser-included offenses, the defendant is acquitted of count (12).

III.

In his final issue, the defendant challenges the length and the imposition of consecutive service of his felony sentences. He does not challenge the range determination, nor does he challenge the misdemeanor sentence for aggravated criminal trespass.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." Id. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. Id. If appellate review reflects the trial court properly considered all relevant factors and if its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The sentencing hearing consisted of the arguments of counsel, the defendant's allocution to the court, and the admission of the presentence report, a victim impact statement, and certified copies of Georgia conviction records. This record as a whole reflects that the defendant had a claimed, but unverified high school education. At the time of sentencing, he was 45 years of age and had been incarcerated for two years awaiting trial. He told the court that he had reformed from drinking and taking drugs, had experienced a religious conversion, and had completed "domestic" classes.

He had been convicted previously of assault against Mildred McMillan on September 4, 1997 and was on probation for this conviction when he committed the crimes presently under review. He also had previously been convicted of driving on a revoked license (1995), two counts of drug possession (Georgia, 1986), theft (Georgia, 1986), forgery (Georgia, 1983), possession of marijuana (Georgia, 1982), passing worthless checks (Georgia, 1979), assault (Georgia, 1979), kidnapping (Georgia, 1976), assault (Georgia, 1976), and robbery (Georgia, 1976). The victim

indicated in her "impact" statement that she had suffered physical and mental pain because of the defendant's crimes, and she urged the court to incarcerate the defendant for the remainder of his life.

In establishing the length of the sentences, the trial court applied to all felony convictions enhancement factors (1), that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the sentencing range; (8), that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (9), that the defendant used or possessed a deadly weapon during the commission of the offense; and (12), that the defendant willfully inflicted bodily injury during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1), (8), (9), (12) (1997). The trial court applied enhancement factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, to all convictions except sexual battery. See Tenn. Code Ann. § 40-35-114(7) (1997). The trial court found no applicable mitigating factors.

On the Class E felony sexual battery conviction, the trial court imposed a maximum Range II sentence of four years. See Tenn. Code Ann. § 40-35-112(b)(5) (1997). On the Class B felony conviction of aggravated kidnapping, the trial court imposed an eleven year sentence in Range I, in which the maximum is twelve years. See Tenn. Code Ann. § 40-35-112(a)(2) (1997). The defendant is subject to a 100 percent release eligibility date on the aggravated kidnapping conviction, subject to sentence reduction credits that may not exceed fifteen percent. See Tenn. Code Ann. § 40-35-501(i) (1997). On the Class C felony aggravated assault conviction, the trial court imposed a sentence of nine years in Range II, in which the maximum sentence is ten years. See Tenn. Code Ann. § 40-35-112(b)(3) (1997).

The trial court ordered these felony sentences to be served consecutively, resulting in an effective sentence of 24 years. In imposing consecutive felony sentences, the trial court found that the defendant is a professional criminal, has an extensive criminal record, is a dangerous offender, and is sentenced for an offense committed while on probation. See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4), (6) (1997).

First, we review the defendant's claims that the felony sentences were excessive. Because we determine that the trial court misapplied enhancement factors, we review the determinations of sentence length *de novo* without a presumption of correctness.

Enhancement factor (1)

The defendant does not challenge the application of enhancement factor (1) to all convictions. We agree that the factor applies. Most of the prior convictions were remote in time; however, the 1997 assault was committed against the victim in the present case. Thus, factor (1) is entitled to significant weight, especially in light of the involvement of the same victim.

<u>Enhancement factor (7)</u>

The defendant argues that the evidence fails to establish that he committed aggravated assault so as to gratify his desire for pleasure or excitement. We disagree.

Enhancement factor (7) can be applied in sentencing on a rape conviction when the evidence establishes that the rape was perpetrated to gratify the defendant's desire for pleasure or excitement. <u>State v. Kissinger</u>, 922 S.W.2d 482, 489 (Tenn. 1996). On the other hand, factor (7) is unavailable to enhance a sexual battery conviction, because sexual battery involves sexual contact and, as such, the "offense necessarily includes the intent to gratify a desire for pleasure or excitement." <u>See</u> <u>id.</u> at 489-90; <u>see</u> <u>also</u> Tenn. Code Ann. § 39-13-501(6) (1997) (sexual contact includes touching "for the purpose of sexual arousal or gratification"). <u>But</u> <u>see</u> <u>State v. Robbie James</u>, No. M2000-00304-CCA-RM-CD, concurring slip op. at 2 (Tenn. Crim. App., Nashville, Mar. 20, 2000) (Witt, J., concurring) (concluding that Code section 39-13-501(6) requirement "of a purpose of sexual arousal or gratification refers only to the . . . touching of 'clothing covering the immediate area' of actual intimate parts"). This court has applied <u>Kissinger</u> to disallow the use of factor (7) in sexual battery cases. <u>See</u> <u>State v. David Calloway</u>, No. 03C01-9808-CR-00324, slip op. at 9 (Tenn. Crim. App., Knoxville, Nov. 23, 1999); <u>State v. Barry Waddell</u>, No. 01C01-9801-CR-00016, slip op. at 9 (Tenn. Crim. App., Nashville, June 1, 1999). We conclude that the trial court properly declined to apply factor (7) to the sexual battery conviction, but we do not believe that this determination precludes a finding that the factor applies to the aggravated assault conviction.

The record supports a finding that the defendant committed aggravated assault so that he could fulfill his desire to engage in sexual activity with the victim. Both the victim's and the defendant's accounts of the events of November 27-28, 1997, as disparate as they may have been, were replete with narratives of sexual episodes. Based upon the victim's version, sexual activity was the defendant's apparent motive for committing the kidnapping and the violent assaults. Moreover, the evidence suggests that the defendant's interest in sexual activity was his desire for pleasure or excitement. We conclude that the defendant's search for a lubricant indicated his desire for arousal and pleasure.[3] Accordingly, the record supports a conclusion that the aggravated assault conviction may be enhanced by factor (7).

Thus, the felony sentences other than the sexual battery sentence are properly enhanced via factor (7), a factor that we accord moderate weight.

<u>Enhancement factor (8)</u>

---

[3] Even though the victim testified that the defendant ejaculated during each sexual penetration, our supreme court has held that "proof of orgasm" does not show the defendant's motive for committing the crime of rape. <u>Kissinger</u>, 922 S.W.2d at 490.

The defendant concedes that he was on probation for assault when the present offenses were committed and that, accordingly, factor (8) applies; however, we must decline to accept the defendant's concession on this point. Enhancement factor (8) does not apply when the only basis for applying it is that the offense for which the defendant is being sentenced occurred while the defendant was on probation. See, e.g., State v. Dustin Dewayne Davis, No. 03C01-9712-CR-00543 (Tenn. Crim. App., Knoxville, Mar. 15, 1999), perm. app. denied (Tenn. 1999); State v. Andra Lamar Dillard, No. 01C01-9804-CC-00157 (Tenn. Crim. App., Nashville, Sept. 20, 1999); State v. Hayes, 899 S.W.2d 175, 185-86 (Tenn. Crim. App. 1995).[4]

On the other hand, the uncontroverted listing of the defendant's prior convictions in the presentence report shows that on January 29, 1987 a forgery probation was revoked, and on July 7, 1988 a drug offense parole was revoked. We conclude that these events supply a basis for finding a "previous history of unwillingness to comply with the conditions of a sentence involving release in the community." See Tenn. Code Ann. § 40-35-114(8) (1997). Due to the remoteness in time of the previous revocations, however, we assign the factor little weight.

### Enhancement factor (9)

The use or possession of a deadly weapon is not an element in any of the conviction offenses and is available as an enhancement factor; however, the defendant challenges the factual basis for applying the factor. He correctly states that the only evidence of weapon possession was the victim's testimony that the defendant picked up two knives when he entered the Styles house and carried them while he pulled the victim by the hair through the house. He then laid the knives down and did not possess any deadly weapon during the remainder of the episode with the victim after leaving the Styles house. He argues that factor (9) cannot be applied to the offenses that were remote to the discarding of the knives.

The defendant's argument has merit in principle but is impaired by the limited record before us. The record does not contain any arguments to the jury or the trial court's jury instructions. For this reason, we cannot discern what elections were made with respect to the possible multiple acts of assault, sexual assault and kidnapping. To the extent that the absence of a full record precludes this court from reviewing the defendant's related issues, he, as the appellant who is burdened with the duty to present a full and fair record, is deemed to have waived consideration of the issue, and the trial court's ruling is presumed to be correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); Tenn. R. App. P. 24(b).

On the other hand, it is clear that any sexual battery occurred distantly in time and space from the Styles house where the knives were discarded. The defendant had no weapon in

---

[4] We point out that enhancement factor (13) is designed to cover the situation when the offense being sentenced is committed while the defendant is on bail, probation, parole or another form of release, "*if such release is from a prior felony conviction.*" Tenn. Code Ann. § 40-35-114(13) (1997) (emphasis added). In the present case, factor (13) does not apply because the defendant was on probation for a misdemeanor assault when he committed the offenses for which he is now being sentenced.

either of the houses on Boyd Street or in the rail car. We conclude that enhancement factor (9) should not have been applied to the sexual battery conviction, and we decline to apply it to that conviction.

Enhancement factor (12)

The defendant concedes that factor (12), that the defendant willfully inflicted bodily injury upon the victim, applies to the aggravated kidnapping and sexual battery convictions, but he challenges its application to aggravated assault. As it pertains to the conviction of aggravated assault on count (1), aggravated assault is committed by one who

> [i]ntentionally and knowingly commits an assault as defined in §39-13-101 and . . . after being enjoined or restrained by an order . . . of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual . . . intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against such individual.

Tenn. Code Ann. § 39-13-102(a), (c) (1997). As assault is committed by one who

> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a) (1997).

We are not privy to the arguments of counsel and the trial court's jury instructions, and we do not know whether the jury was directed to consider a single mode of committing assault and/or a single mode of committing the section 39-13-102(c) aggravated assault. Nevertheless, one available mode of committing assault and subsection (c) aggravated assault is the causation of actual bodily injury, and it is clear from the record that the defendant caused the victim to suffer bodily injury. We conclude that under the facts of this case, factor (12) should not be applied to enhance the defendant's aggravated assault conviction, because it duplicates elements of the offense. See Tenn. Code Ann. § 40-35-114 (1997).

We find that the use of factor (12) to enhance the sexual battery and aggravated kidnapping convictions should be accorded significant weight.

-14-

We find no reason to depart from the trial court's determination that no mitigating factors apply.

Thus, in summary, the following enhancement factors apply to the following felony convictions:

| Offense | Factors applicable | Weight |
|---|---|---|
| Sexual battery | (1) | significant |
| | (8) | slight |
| | (12) | significant |
| Aggravated kidnapping | (1) | significant |
| | (7) | moderate |
| | (8) | slight |
| | (9) | moderate |
| | (12) | significant |
| Aggravated assault | (1) | significant |
| | (7) | moderate |
| | (8) | slight |
| | (9) | moderate. |

"Should there be enhancement but no mitigating factors for a Class B, C, D or E felony, then the court may set the sentence above the minimum in the range but still within the range." Tenn. Code Ann. § 40-35-210(d) (1997). Thus, when we start with the minimum sentence in the range, see Tenn. Code Ann. § 40-35-210(c) (1997), and apply the enhancement factors to each conviction, we impose the following sentences: Range II sexual battery (count (1)), three years; Range I aggravated kidnapping (count (8)), eleven years; and Range II aggravated assault (count (11)), eight years.

We now turn to the defendant's challenge to the trial court's imposition of consecutive sentencing. Code section 40-35-115 establishes various bases for imposing consecutive sentences. Of these, the trial court relied upon the defendant's status as a professional criminal, the defendant's extensive record of criminal activity, his status as a dangerous offender, and the circumstance that the present offenses were committed while he was on probation. See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4), (6) (1997).

We observe initially that the record contains little basis for applying factor (1), that the defendant is "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood," or factor (4), that the defendant was a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann. § 40-35-115(b)(1), (4) (1997).

-15-

Nevertheless, we need not spend time and lineage analyzing the propriety of these factors. "Only one factor need be proven to support a consecutive sentence." State v. Ernest Leon Powers, Jr., No. 03C01-9606-CC-00222, slip op. at 18 (Tenn. Crim. App., Knoxville, Oct. 28, 1997). In the present case, the record cogently supports the application of factor (2), that the defendant has an extensive criminal record, and factor (6), that he committed the present offenses while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (6) (1997).

Accordingly, the imposition of consecutive service of the felony sentences is justified and is affirmed. Therefore, the new effective sentence imposed as a result of our *de novo* review is 22 years.

The judgment of the trial court is affirmed with respect to count (8) and is affirmed as modified with respect to counts (1) and (11). The judgment of the trial court is reversed and vacated with respect to count (12), and on that count a judgment of acquittal shall be entered.

_____
JAMES CURWOOD WITT, JR., JUDGE